UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

PRIMEPAY, LLC,

        Plaintiff,

v.

ONESOURCE VIRTUAL, INC.,

        Defendant.

CAUSE NO. 3:18-CV-300 DRL

## OPINION AND ORDER

This is a dispute over a payroll tax processing software called TaxEx. Pending for five years, this case has a lengthier history. Suffice to say for now, PrimePay, LLC asserts sole ownership rights to TaxEx in this declaratory judgment action and claims OneSource Virtual, Inc. breached its agreement to provide all TaxEx software codes and improperly charged for services. OneSource counterclaims by arguing that it has unlimited rights in TaxEx and that PrimePay has limited rights of use. Both parties request summary judgment. The court grants summary judgment in part.

## BACKGROUND

On July 1, 2011, Crystal Solutions, Inc. (a predecessor in interest to OneSource) and Interlogic Outsourcing, Inc. (IOI, a predecessor in interest to PrimePay) entered into a Transfer Agreement (called an Agreement for Transfer of Rights Related to Software) [ECF 126-1]. Crystal developed TaxEx and agreed "to sell, transfer and assign to IOI ownership rights to all software codes and copyright ownership for the Software Product [later known as TaxEx] and all codes and copyrights related to future improvements, modifications, enhancements and maintenance of [TaxEx]"—what the Transfer Agreement collectively called the "Software Product Package" [*Id.* § 1].

This agreement was subject to certain limitations: "[Crystal] shall retain unlimited rights to own, develop, use, license and resell the [S]oftware Product Package as it sees fit, and (b) IOI may use the

Software Product Package in the conduct of its business, provide the same for use in the business of its affiliates and may transfer its rights to any party acquiring a material portion the business and/or assets of IOI or its affiliates" [*Id.*]. Crystal agreed "in the future, at no additional cost to IOI, [to] promptly provide to IOI all software codes for improvements, modifications, enhancements and maintenance of the Software Product Phase[1] that [had] been purchased, to which IOI shall, also, acquire ownership and copyright rights, subject to and consistent with the stated provisions in [Section 1]" [*Id.* § 5]. The Transfer Agreement, governed by Indiana law, bound their successors and assigns [*Id.* §§ 6, 8].

More than two years later (October 21, 2013), the parties amended the Transfer Agreement [ECF 126-1, OSVAP_005]. The First Amendment discussed payment. Because 70 percent of TaxEx's development had been completed, IOI agreed to pay $350,000 (70 percent of the total purchase price) to Crystal. The company would pay the remaining balance once TaxEx had been fully developed. Upon the $350,000 payment, "IOI will have acquired the ownership rights provided for in . . . the [Transfer] Agreement for those portions of the Software Product that have been provided or made available to IOI as of this date and shall acquire the same ownership rights to all remaining portions of the Software Product as and when the same are provided or made available to IOI" [*Id.* § 4].

The First Amendment also echoed the provision of software codes: "[Crystal] acknowledges that, at no additional cost to IOI, it is obligated to and shall promptly provide IOI all software codes for all improvements, modifications, enhancements and maintenance of the Software Product, to which IOI shall have all ownership and copyright rights as provided in and subject to the terms of the [Transfer] Agreement" [*Id.* § 5]. The First Amendment imposed no restrictions on "any improvements, modifications, enhancements or maintenance [IOI] may desire or elect to provide in any way to the

---

[1] The parties provided the court a redacted version of the Transfer Agreement, and the court wonders (given its drafting) whether the redacted Section 2 contains a definition of Software Product Phase. The Transfer Agreement nevertheless provides enough context to understand the term as the agreement elsewhere outlines a schedule for the development of TaxEx [ECF 126-1 § 3]. Phase I of development was to be completed and available for testing by December 31, 2011. Phase II was to be completed by March 31, 2012, and Phase III by September 30, 2012 [*Id.*].

Software Product" and stated that "IOI shall have sole and exclusive ownership of all improvements, modifications and enhancements it makes to the Software Product" [*Id.*]. The parties agreed that "[e]xcept as expressly modified [in the First Amendment], the [Transfer] Agreement remains unmodified, and in full force and effect" [*Id.* at OSVAP_006].

On April 17, 2014, Crystal and IOI entered into a TaxEx Support and Services Agreement (TSSA) and an amendment to the TSSA [ECF 126-14]. Crystal agreed to provide support and services for IOI's use of TaxEx, including training, technical support and services, and customer service [*Id.* § 1]. As amended, the TSSA lasted for one year and automatically renewed unless either Crystal or IOI terminated the agreement for any reason by providing written notice at least 90 days before agreement expired [*Id.* OSVAP_0013 § 3]. The TSSA was governed by Arizona law [*Id.* OSVAP_0010 § 8].

On September 21, 2015, Crystal sold its assets to OneSource in an Asset Purchase Agreement [ECF 126-4]. It addressed TaxEx rights: "the assets and rights transferred by [Crystal] to [OneSource] under this Agreement are subject in all respects to the rights of [IOI] in the Software Product and the Software Product Package as described in the [Transfer Agreement] and its subsequent amendment … and the rights of IOI in the TaxEx and the Product as described in the [TSSA] and its subsequent amendment" [*Id.* § 2.02(a)(x)]. The APA carved out an allowance for IOI's ownership rights: "IOI's ownership rights in and right to use the Software Product, Software Product Package, TaxEx, and the Product in IOI's … business operations are not affected by this [APA] and … nothing contained in this agreement … will be construed to in any way restrict, qualify, or limit the rights of IOI, or any of IOI's Affiliates or successors or assigns, to own, develop, and use the Software Product, Software Product Package, TaxEx, or the Product in their respective business operations" [*Id.*].

The APA required IOI's consent to the assignment of the TSSA and the First Amendment [*Id.* Sched. 3.02]. In listing intellectual property, Crystal's "rights in the TaxEx software, but subject in all respects to the rights of [IOI] in the Software Product and the Software Product Package as described

in the [Transfer Agreement] and the Product as described in the [TSSA]," were included, as was the "[s]ource code for TaxEx software" [*Id.* Sched. 3.05(b)]. The APA assigned certain contracts to OneSource at closing, including the 2011 Transfer Agreement, its 2013 First Amendment, and the 2014 TSSA and its same-day amendment [*Id.* Sched. 3.06], noting that "IOI has the right under the Transfer Agreement and the [TSSA] to receive all updates, modifications, tax codes, and the like in relation to the Software Product, Software Product Package, TaxEx, and the Product on an ongoing basis and [OneSource] is assuming [Crystal's] obligations to IOI to provide such updates" [*Id.*].

Three days after the APA was signed, on September 24, 2015, OneSource's human resources director (Nick Branen) sent a letter to IOI's president (Najeeb Khan) to provide notice of the asset sale [ECF 126-12]. He wrote that the assignment of contracts to OneSource was "subject in all respects to the rights of IOI in the Software Product and Software Product Package as described in the Transfer Agreement and the rights of IOI in the TaxEx and the Product as described in the [TSSA]" [*Id.*]. "Furthermore, IOI has the right under the Agreements to receive all updates, modifications, tax codes, and the like in relation to the Software Product, Software Product Package, TaxEx, and the Product on an ongoing basis and OneSource is assuming Crystal's obligations to IOI to provide such updates, modifications, tax codes, and the like under the Agreements" [*Id.*].

On February 28, 2017 and November 5, 2017, OneSource provided IOI with updated source code [ECF 41-4 at App. 100 ¶ 4]. On January 3, 2018, OneSource's chief financial officer (John Bax) provided IOI's secretary/treasurer (A. Robert O'Brien) with notice that OneSource would terminate the TSSA effective April 16, 2018 [ECF 126-15]. On February 12, 2018, OneSource declined IOI's request for updated source code [ECF 41-4 at App. 100 ¶ 4]. On April 27, 2018, IOI sued OneSource. On October 9, 2018, OneSource filed its answer and counterclaims.

While this case pended, IOI filed for bankruptcy (*In re Interlogic Outsourcing, Inc.*, 20-00325 (Bankr. W.D. Mich.)). This case was stayed from August 20, 2019 to August 12, 2021 during the

bankruptcy proceeding. In bankruptcy, PrimePay entered into an Asset Purchase Agreement with IOI on September 27, 2019 [ECF 126-13, OSVAP_0396]. IOI sold all its assets and rights (save for personal effects), including all scheduled contracts [*Id.* Sched. 2.1(a)] and all intellectual property to the extent assignable or transferable [*Id.* §§ 2.1(a), (b)]. The APA, governed by Delaware law, maintained the status quo of the rights and obligations that OneSource enjoyed under what the APA called the "software license agreement" with OneSource—using that characterization twice—until OneSource's consent could be obtained [*Id.* §§ 8.4, 12.6].

The bankruptcy court approved this APA on September 30, 2019 [*Id.* OSVAP_0384]. The court's order specifically addressed TaxEx: "For the avoidance of doubt, nothing in this Sale Order authorizes the Debtors to assume, reject, or assume or assign their rights to the TaxEx Software as provided in that certain [Transfer Agreement], dated July 1, 2011, by and between [Crystal] and [IOI]" [*Id.* OSVAP_0392].

That same day, IOI and PrimePay entered into a Transition Services Agreement [ECF 131-8]. This contract likewise called IOI's rights as born from a "license agreement" with OneSource relating to the TaxEx software and source code:

> To the extent that [IOI's] rights to TaxEx may not be assigned to [PrimePay] without the consent of [OneSource] and such consent is not obtained by Closing, [IOI], at their expense, shall use their best efforts (including dismissal or its litigation against [OneSource]) to obtain any required consent by [OneSource] as soon as possible. Unless and until [OneSource], [IOI] and [PrimePay] agree otherwise or the Bankruptcy Court enters an order regarding the assumption or rejection of any TaxEx agreement with [OneSource], the status quo shall be maintained with respect to the respective rights and obligations of [IOI] and [OneSource] under any such license agreement. Until such time as [PrimePay] and [OneSource] have entered into a mutually acceptable license agreement for the use of software to compute federal, state (in multiple states) and local income tax withholdings to be deducted from employees' pay, to the maximum extent permitted by law, [IOI] shall act as [PrimePay's] agent in order to obtain for it the benefits under the [OneSource] license agreement and shall cooperate with [PrimePay] in any other reasonable arrangement designed to provide such benefits to [PrimePay].
>
> In the event that [IOI's] rights to TaxEx have not been assumed and assigned to [PrimePay] and/or [PrimePay] has not entered into a new license and support

agreement with [OneSource] regarding TaxEx prior to the end of the Transition Period, [IOI] and [PrimePay] agree that the Transition Period shall be extended automatically, without further action by [IOI] and [PrimePay], through June 30, 2021.

[*Id.* at 13 (Sched. A)]. The Transition Services Agreement listed the TSSA as an unassigned contract [*Id.* at 18 (Sched. A)].

On August 19, 2020, PrimePay moved to intervene here. A month later, IOI and PrimePay entered into a Settlement Agreement [ECF 131-7]. In it, IOI agreed "that PrimePay had and shall have sole ownership of all copyright rights and other intellectual property rights [] in and to the TaxEx software that IOI currently has or had as of the date of the Sale Order (September 30, 2019)" [*Id.* § 2]. The parties agreed that "PrimePay has acceded to all of [IOI's] right, title, and standing to (a) receive all rights and benefits pertaining to the TaxEx software" [*Id.* § 4].

OneSource then initiated an adversary proceeding, asking the bankruptcy court to interpret the scope and effect of its Sale Order and to issue a declaratory judgment regarding TaxEx's ownership. On July 30, 2021, the bankruptcy court abstained, declining to determine the meaning of the Transfer Agreement, whether or to what extent it was preformed or breached and the competing interests of the parties in TaxEx, and leaving it to this court to decide these issues [ECF 126-7 at 31]. OneSource appealed, and that appeal was dismissed on April 22, 2022. *See In re Interlogic Outsourcing, Inc.*, 2022 U.S. App. LEXIS 11673 (B.A.P. 6th Cir. Apr. 22, 2022).

Back home again in Indiana, the court stayed the case from August 5, 2022 to October 3, 2022 to afford the parties the opportunity to mediate. Once lifted, on October 14, 2022, the court ordered PrimePay's substitution for IOI. The parties briefed the crossmotions for summary judgment, and the court held oral argument on May 9, 2023.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The non-moving party must present the court with evidence on which a reasonable jury could rely to find in its favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020). In a case involving crossmotions for summary judgment, each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A.  *Standing.*

OneSource questions PrimePay's Article III standing. Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The United States Constitution confines the judiciary's power to "Cases" and "Controversies." U.S. Const. Art. III § 2. For a case or controversy to exist, a plaintiff must have standing—an injury, fairly traceable to the defendant's conduct, that the court's decision will likely redress. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must have an actual stake in the dispute. *See Matlin v. Spin Master Corp.*, 979 F.3d 1177, 1181 (7th Cir. 2020).

Without one, a court's order is nothing more than an advisory opinion. *See id.* Article III's "case or controversy" requirement prohibits "advisory opinions that do not affect the rights of the parties before the court." *Id.* The court isn't a law office established for legal advice—the federal judiciary decides cases, not hypothetical outcomes. If the court's decision doesn't affect a litigant's rights, "the aggrieved party [is] unable to illustrate the redressability component of standing, rendering any judicial decision in the case an impermissible advisory opinion." *United States v. Brixen*, 908 F.3d 276, 280 (7th Cir. 2018).

OneSource says only parties to a contract, those in privity with them, and intended third-party beneficiaries may seek to enforce a contract under Indiana law. OneSource argues that PrimePay isn't a party to the Transfer Agreement and wasn't assigned rights to the agreement by IOI, so PrimePay lacks standing to sue for its breach. PrimePay initially counters by pointing out that OneSource omitted this issue in its answer, but Article III standing relates to the court's subject matter jurisdiction and cannot be waived. And that non-waiver equally applies to arguments in these crossmotions.

PrimePay also says OneSource's argument only concerns counts two (breach of Transfer Agreement) and three (refund of improper charges under the TSSA), but that it concedes standing on count one (declaratory judgment on the Transfer Agreement). If PrimePay has standing on count one, its logic goes, then the court has the power to entertain the entire suit. But standing is not "dispensed in gross," so plaintiffs "must demonstrate standing for each claim they press and for each form of relief they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021); *accord DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). This applies equally to a claim under the Declaratory Judgment Act. *See Ray v. Bedi Trust*, 611 F. Supp.3d 567, 583 (N.D. Ind. 2020) ("The Declaratory Judgment Act is not meant to keep the court 'on retainer' to answer questions that may hypothetically come up.").

The Transfer Agreement permitted IOI to sell its rights: IOI "may transfer its rights to any party acquiring a material portion [of its] business and/or assets" [ECF 126-1 § 1; *see also id.* § 6].

OneSource nevertheless argues that IOI never assigned the Transfer Agreement to PrimePay. OneSource claims that, when IOI (PrimePay) tried to do so, OneSource objected and consequently the Sale Order expressly said the Transfer Agreement wasn't required to be assigned to PrimePay and the Transfer Agreement was removed from the schedule of assigned contracts.

PrimePay says it didn't need to take assignment of the Transfer Agreement because it took IOI's ownership interest in its rights in TaxEx through the Sale Order. PrimePay argues that IOI already had all software and copyright rights in TaxEx due to IOI's full performance of the Transfer Agreement and then passed these rights to PrimePay in the Sale Order via the intellectual property provisions. OneSource counters that the APA authorized by the Sale Order shows that IOI only transferred to PrimePay the contracts identified in Schedule 2.1(a), which omitted the Transfer Agreement. And the Sale Order excluded the Transfer Agreement's assignment from IOI to PrimePay: "For the avoidance of doubt, nothing in this Sale Order authorizes the Debtors to assume, reject, or assume or assign their rights to the TaxEx Software as provided in that certain [Transfer Agreement], dated July 1, 2011, by and between Crystal [and IOI]."

PrimePay pivots to focus on the contract claim that at the time was pending here when the bankruptcy court issued the Sale Order. PrimePay says the APA and Sale Order assigned this contract claim to the company. The APA seems to do no such thing. It allowed for the transfer of rights and claims relating to assumed contracts [ECF 126-13 § 2.1(g)] but excluded any rights or claims relating to excluded assets, including excluded contracts [*id.* §§ 2.2(f), (q)]. The APA defined "claim" to include any right to payment and any right to an equitable remedy for a contract's breach [*Id.* § 1.1]. Consequently, any right to a claim for the Transfer's Agreement's breach wasn't transferred to PrimePay via the APA.

Finding no support in the APA or the Sale Order, PrimePay turns to the bankruptcy court's abstention order and in particular one line in this order: "regardless of whether we suppose the Transfer Agreement was not an executory contract (as PrimePay argues), or was executory but is now

9

rejected (as OneSource must allow), the court finds that IOI effected a transfer of its rights in the Transfer Agreement and the TaxEx software package, just not by operation of § 365" [ECF 126-7 at 29]. This argument falters for two reasons. First, this order expressly declined to interpret the Transfer Agreement and the parties' competing interests in TaxEx; and second, this language proves extrinsic to the APA and the bankruptcy court's order that approved the sale, and nothing within the APA or the bankruptcy's court's Sale Order presents as ambiguous.

Only a later Settlement Agreement saves PrimePay today [ECF 131-7]. IOI and PrimePay decided to resolve any dispute about their respective rights to the TaxEx software. In this agreement, IOI agreed "that PrimePay had and shall have sole ownership of all copyright rights and other intellectual property rights [] in and to the TaxEx software that IOI currently has or had as of the date of the Sale Order (September 30, 2019)" [*Id.* § 2]. The parties also agreed that "PrimePay has acceded to all of [IOI's] right, title, and standing to (a) receive all rights and benefits pertaining to the TaxEx software; (b) institute and prosecute all suits and proceedings and take all actions that PrimePay, in its sole discretion, may deem necessary or proper to collect, assert, or enforce any claim, right, or title of any kind in and to any and all of the TaxEx software" [*Id.* § 4; *see also id.* § 3].

OneSource, without citing to anything specific in the Settlement Agreement, just the document generally, says the agreement never assigned the Transfer Agreement, but it cannot quibble with its plain and broad language even if "Transfer Agreement" never appears in these exact words. OneSource also purports to quote text from the Settlement Agreement that seems not to exist. Needless to say at this point, OneSource cannot contest the plain operation of this Settlement Agreement. Its citation to *Kaplan v. Shure Bros.*, 266 F.3d 598, 604 (7th Cir. 2001) (Illinois law), offers no help either. Whether a party's receipt of an interest in an asset vests the party with standing to sue on a contract related to this asset under Illinois law, the Settlement Agreement here (governed by Delaware law) expressly assigned not just the interests but any contract claim related to TaxEx. This includes any claim IOI once had but

then assigned to PrimePay related to TaxEx under the Transfer Agreement or TSSA. PrimePay has standing to proceed.

      B. *Declaratory Judgment of Unrestricted Ownership and Copyright Rights in TaxEx (Count 1).*

PrimePay seeks a declaratory judgment that it has unrestricted ownership and copyright rights in TaxEx. OneSource says the declaratory judgment would be procedurally improper because of IOI's previous admissions to this court. OneSource represents that "IOI has admitted to this Court on multiple occasions that it has no rights in TaxEx," citing a joint status report [ECF 122]. This report does no such thing. And PrimePay has been substituted for IOI to pursue the complaint's claims.

To the merits the parties finally go. Based on the Transfer Agreement's language, they disagree whether PrimePay or OneSource owns TaxEx. The court (sitting in diversity) applies Indiana's choice of law rules. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938); *Ruiz v. Blentech Corp.,* 89 F.3d 320, 323 (7th Cir. 1996). The Transfer Agreement says Indiana law governs the contract, and both parties agree, so the court will interpret the agreement through its selected lens of Indiana law. *See Great West Cas. Co. v. Robbins*, 833 F.3d 711, 715 (7th Cir. 2016); *see also McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014); *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004).

A contract's interpretation is generally a question of law, *Song v. Iatarola*, 76 N.E.3d 926, 933 (Ind. Ct. App. 2017), controlled by the parties' intent as expressed by clear contractual language, *City of Jeffersonville v. Env't Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011). "[W]hen the terms of a contract are drafted in clear and unambiguous language, [the court] will apply the plain and ordinary meaning of that language and enforce the contract according to [its] terms." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012).

"Courts do not have the power . . . to insert language into a contract [that] was not inserted by the parties, and [courts] will not undertake to rewrite the parties' contract." *Gen. Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 135 (Ind. Ct. App. 1997) (citation omitted). "If a contract is ambiguous, the

court may consider extrinsic evidence, and the construction of the contract becomes a matter for the trier of fact." *Song*, 76 N.E.3d at 933. Mere disagreement between the parties about a provision's meaning won't render a provision ambiguous. *G&G Oil Co. of Ind. v. Cont'l W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021). "An ambiguity exists only [when] reasonable people could come to different conclusions about the contract's meaning." *Roy A. Miller & Sons, Inc. v. Indus. Hardwoods Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002) (quotations omitted).

Both parties characterize the Transfer Agreement as clear and unambiguous. PrimePay says it received ownership rights to TaxEx, whereas OneSource says PrimePay merely received a license. The debate centers on Section 1, with PrimePay emphasizing the opening language (in red) and OneSource emphasizing the qualifying language (in blue):

> *Developer [OneSource] agrees to sell, transfer and assign to [PrimePay]* <u>*ownership rights to all software codes and copyright ownership for the Software Product [TaxEx] and all codes and copyrights related to future improvements, modifications, enhancements and maintenance of the Software Product*</u> (collectively the "Software Product Package"), *subject to the following: (a) [OneSource] shall retain unlimited rights to* <u>*own*</u>*, develop, use, license and resell the [S]oftware Product Package as it sees fit, and (b) [PrimePay] may use the Software Product Package in the conduct of its business,* provide the same for use in the business of its affiliates and may transfer its rights to any party acquiring a material portion the business and/or assets of IOI or its affiliates.

[ECF 126-1 § 1 (emphases added)]. Both clauses purport to *grant* ownership rights and *retain* unlimited ownership rights in the same thing—the Software Product Package (as defined). What does it mean to grant ownership of something but likewise retain full ownership of it? Therein lies the fundamental ambiguity of this agreement that neither party effectively resolves based on its plain language.

Instead, both parties advance the view that the other has a license—the right to use TaxEx in prescribed ways. OneSource claims its qualifying language (in blue) means that PrimePay received a mere right to use TaxEx in its business, whereas PrimePay contends that the same language means that OneSource preserved a "grant back" license that allowed OneSource to continue to make modifications to the software that PrimePay otherwise owned. But the Transfer Agreement plainly speaks out both sides of its mouth in granting or withholding, not mere use, but ownership of the same thing. And the

opening grant to PrimePay never speaks in terms of use, but ownership, so the carve out or qualifying language (in blue) could reasonably be construed as explaining that "ownership" means mere "use" in PrimePay's business or equally it could reasonably be construed as preserving no "ownership" in OneSource but its own mere right to use in further development. Words are known by the company they keep, and the parties offer other textual markers and rules of construction to favor their reading, but the court cannot say as a matter of law that these guideposts foreclose all ambiguity, as at times even they compete.

Although cases involving contract interpretation are usually appropriate for summary judgment, "[w]hen the terms of a contract are ambiguous or uncertain, however, and its interpretation requires extrinsic evidence, its construction is left to the factfinder." *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 840 (Ind. Ct. App. 2016); *see also Noblesville Redevelopment Comm'n v. Noblesville Assocs. Ltd. P'ship*, 674 N.E.2d 558, 562 (Ind. 1996). "Extrinsic evidence is evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement." *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014) (citation omitted). Though Indiana law once recognized two types of ambiguities—patent and latent—extrinsic evidence may explain both. *See Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006) ("distinction between patent and latent ambiguities is not useful, and it is proper to admit extrinsic evidence to resolve any ambiguity").

Extrinsic evidence likewise presents a genuine triable issue as to the Transfer Agreement's meaning. In looking at course of conduct, PrimePay says OneSource provided source code for the software on four occasions, but providing source code isn't telling of whether PrimePay acquired and OneSource retained ownership or licensing rights. On this record, it offers little guidance on what the parties intended in the Transfer Agreement.

OneSource presents two pieces of extrinsic evidence. First, the company points to a series of emails between IOI's president (Najeeb Khan) and OneSource's CFO (John Bax) [ECF 126-9]. These emails postdate the Transfer Agreement by almost six years. Their communications merely highlight the fundamental fact question and indeed seem at times to undercut their own respective positions today. For instance, on May 2, 2017, IOI (PrimePay's predecessor) suggests it received a mere license:

> Paragraph 1 of the [Transfer Agreement] states IOI may use the software in the conduct of its business and may provide the same use to its affiliates. IOI may transfer its rights to the software to anyone acquiring assets of IOI or its affiliates. I understood the use to be limited to the conduct of our business […] The updates which [OneSource] as successor and assignee of Crystal Solutions is required to provide remain subject to the same usage rights. I am not sure why you think that IOI has unlimited rights to market or transfer the software beyond what is stated. IOI's rights and those of its affiliates are as stated in the documents[.]

Not to be outdone, PrimePay points to a factually competing view from OneSource's representative on April 20, 2017:

> Right now, you/I/we simply don't have [a clear agreement], all we have is the original intent you and the [OneSource] founders and the paperwork just doesn't match what you all intended. While we obviously trust each other and understand the intent, it is important that the intent is made clear in writing for the benefit of future owners of [OneSource] and/or IOI. . . . [The Transfer Agreement] makes it appear that IOI owns all code, copyrights … and I'm told it places no restrictions whatsoever on what you can do with all that. … This is directly opposite of what you said is your understanding. … As you can see, there is no reasonable way for [OneSource] to continue investing in TaxEx if the existing agreements leave it all unclear as to the parties' respective ownership and usage rights.

Though OneSource's extrinsic evidence discusses the grant to be limited to PrimePay's use of the software in its business, and the other email seems to want to agree, other statements in these emails ambiguously refer back to the very agreement that itself is ambiguous: "we believe that the intent of the parties is [] represented" and PrimePay's "rights and those of its affiliates are as stated in the documents." *See Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir. 1990) ("the task of disambiguating ambiguous utterances is for trial, not for summary judgment").

To make matters knottier still, in a later May 11, 2017 email, OneSource responds to IOI (now in interest PrimePay) that their exchange has left the issue unresolved: "I still think we may be speaking past each other to some extent." Indeed, OneSource endeavors then to "draft[] a framework with a few straightforward statements of the rights that we've been discussing and that you apparently think are already adequately addressed in the existing documents." This May 11 email could be understood as either a proposal for a new agreement or a memorialization of their common understanding of the Transfer Agreement. The exchange of communications offers a reasonable factfinder a basis to reach competing conclusions about TaxEx's ownership and the Transfer Agreement's intent.

Second, OneSource relies on the Transition Service Agreement [ECF 131-8]. This agreement uses the word "license" repeatedly when referring to IOI's rights now transferred to PrimePay:

> Unless and until [OneSource], [IOI] and [PrimePay] agree otherwise or the Bankruptcy Court enters an order regarding the assumption or rejection of any TaxEx agreement with [OneSource], the status quo shall be maintained with respect to the respective rights and obligations of [IOI] and [OneSource] under any such <u>license</u> agreement. Until such time as [PrimePay] and [OneSource] have entered into a mutually acceptable <u>license</u> agreement for the use of software to compute federal, state (in multiple states) and local income tax withholdings to be deducted from employees' pay, to the maximum extent permitted by law, [IOI] shall act as [PrimePay's] agent in order to obtain for it the benefits under the [OneSource] <u>license</u> agreement and shall cooperate with [PrimePay] in any other reasonable arrangement designed to provide such benefits to [PrimePay].

> In the event that [IOI's] rights to TaxEx have not been assumed and assigned to [PrimePay] and/or [PrimePay] has not entered into a new <u>license</u> and support agreement with [OneSource] regarding TaxEx prior to the end of the Transition Period, [IOI] and [PrimePay] agree that the Transition Period shall be extended automatically, without further action by [IOI] and [PrimePay], through June 30, 2021.

[*Id.* Sched. A (emphases added)]. When asked at oral argument why the Transition Service Agreement used the word "license," PrimePay said "[i]t was a compromise in a tough situation" but shouldn't be "read as an admission of anything." PrimePay contended that the sale from IOI to PrimePay moved quickly and, as the sale was being contemplated, OneSource objected and held up the sale in bankruptcy. PrimePay says IOI needed to sell its assets quickly, PrimePay needed to continue to service

its customers, and OneSource would only allow this sale to proceed if this language was used. PrimePay used the language in the Transition Service Agreement to get the sale through but intended to continue to fight the ownership battle from the Transfer Agreement in future litigation.

PrimePay cites Section 8.4 of the IOI APA to address this desire to preserve the ownership battle for litigation outside the bankruptcy court, and it seems to express that intent. However, that section also characterizes the Transfer Agreement as granting a license: "To the extent that [IOI's] rights under the software license agreement with [OneSource] may not be assigned to [PrimePay] without the consent of [OneSource] and such consent is not obtained by Closing, [IOI], at its expense, shall use its best efforts (including dismissal of its litigation against [OneSource]) to obtain any required consent by [OneSource] as soon as possible." [ECF 126-13 § 8.4 (emphasis added)]. Until agreed otherwise, "the status quo shall be maintained with respect to the respective rights and obligations of [IOI] and [OneSource] under any such license agreement" [*Id.* (emphasis added)].

The APA and the Transition Service Agreement are both agreements submitted to and approved by the bankruptcy court. OneSource says the language in each—referring to the transfer of rights now to PrimePay as a "license"—points to only one reading of the Transfer Agreement: a license to use, but not ownership rights of TaxEx. Particularly because these statements occur only in agreements between IOI and PrimePay, and materially against their interest in this litigation, one might reasonably give them due weight, but affording weight is a task for the factfinder, not the court on summary judgment. Neither the APA nor the Transition Service Agreement explain what this "license" entails, so the court cannot say as a matter of law that PrimePay has only rights of use (or only certain rights of use) that to this point remain undefined. And a "transaction's structure or label is not dispositive of its legal treatment." *New Nello Operating Co. v. CompressAir*, 168 N.E.3d 238, 242 (Ind. 2021). "The licensing of software, like leases, is premised on the legal concept of a grant of limited property rights without the passage of title," 2 *Computer Contracts*, § 8.01[3] (2023), but "[t]o constitute

a license, the licensor must place meaningful conditions and restrictions on the licensee's use of the software; simply calling an agreement a license does not make it such," *id.* at [1]. Both the APA and Transition Service Agreement preserved the status quo of each party, which begs the open question: to whom did the Transfer Agreement give ownership rights to TaxEx?

"Where the parties offer competing reasonable inferences from extrinsic evidence, the disputed meaning of the contract is a question for the trier of fact not appropriately resolved through summary judgment." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 351-52 (7th Cir. 2015); *see also Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998) (dispute over inferences from extrinsic evidence presented question of fact on the ultimate issue of what contract meant). The court denies the crossmotions for summary judgment on count one.

C.  *Breach of Contract (Count 2).*

PrimePay asks the court to declare that OneSource breached the Transfer Agreement by not providing the current version of the TaxEx source code. PrimePay claims that OneSource breached the Transfer Agreement by failing to acknowledge PrimePay's ownership rights and refusing to provide the source code. The court won't duplicate its discussion on the first part; and, to the extent PrimePay seeks a declaration of respective rights and obligations related to ownership, including the source code, this will be addressed at trial as part of count 1, so the court addresses here only what is in substance a breach of contract claim.

Once more the court starts with the contract's language. Section 1 speaks of transferring to PrimePay "all software codes," and Section 5 likewise speaks of providing to PrimePay "all software codes for improvements, modifications, enhancements and maintenance of the Software Product Phase that has been purchased," albeit subject to Section 1's intended limitations. The First Amendment also required the provision of "all software codes for all improvements, modifications, enhancements and

maintenance of the Software Product, to which IOI shall have all ownership and copyright rights as provided in and subject to the terms of the [Transfer] Agreement."

OneSource disputes the necessary format in which the software code must be provided. "When programmers write code, they write in 'source code,' which is written in a programming language that humans can understand. This source code is then compiled into object code which is essentially a translation of source code into something the computer can understand and execute. Generally, when software is distributed, only the compiled object code is distributed and the programmer retains the source code. Regardless of whether the computer program is in object code or source code form, it is copyrightable and protectable." *Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 755 n.5 (9th Cir. 2008) (citations omitted). There is no dispute that OneSource has both object and source code for TaxEx.

OneSource, on February 28, 2017 and November 5, 2017, provided IOI with updated source code; but, on February 12, 2018, OneSource declined a request for updated source code. Whether this constitutes a breach—and a material breach at that—and who has ownership remain tied to the question left to be decided by the factfinder. As to the separate breach of contract claim, PrimePay has not proven on this record damages.

Under Indiana law, the party claiming a breach of contract bears the burden of proving damages. *Haegert*, 977 N.E.2d at 937; *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 71 F. Supp.3d 866, 898 (S.D. Ind. Dec. 24, 2014). "A mere showing of a breach of contract does not necessarily entitle a plaintiff to damages." *Lincoln Nat'l Life Ins. Co. v NCR Corp.*, 772 F.2d 315, 320 (7th Cir. 1985) (applying Indiana law). Damages won't be awarded based on guess or speculation. *Dana Cos. v. Chaffee Rentals*, 1 N.E.3d 738, 748 (Ind. Ct. App. 2013). Instead, "a plaintiff must have adequate evidence to allow a jury to determine with sufficient certainty that damages in fact occurred, and, if so, to quantify such damages with some degree of precision." *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006) (applying Indiana law).

PrimePay's response puzzles a bit. In a section of its consolidated brief titled "Plaintiff Has Proven Breach And Damages," PrimePay dedicates a paragraph to describing the breach of the Transfer Agreement, then pivots to a paragraph discussing an alleged breach of the TSSA and the monetary damages resulting from that alleged breach. Nothing in this section or any part of PrimePay's briefing seems to argue or prove up damages resulting from any breach of the Transfer Agreement. There is one line that generally refers to an imposition of fees, but no other development. The court won't develop arguments for the parties, *see Gross v. Town of Cicero*, 619 F.3d 697, 704-05 (7th Cir. 2010), and this line alone isn't enough to create a triable issue as to damages.

In reality, perhaps PrimePay isn't actually seeking monetary damages on this count. But it glosses this issue entirely. PrimePay wants the source code, but it never explains, in briefing or at oral argument, why specific performance is warranted and offers no authority for why it would be appropriate here. In its complaint, PrimePay requested a mandatory injunction—a highly extraordinary remedy. At summary judgment, the company includes only a single sentence about an order, never once saying it really wants specific performance or an injunction rather than money damages, or any standards that the company has met for this equitable relief.

Specific performance is an equitable remedy that the trial court may grant in its discretion. *Gabriel v. Windsor, Inc.*, 843 N.E.2d 29, 48 (Ind. Ct. App. 2006). "To give a trial court jurisdiction to order specific performance of a contract, it must be, *inter alia,* capable of being specifically enforced and of such nature the court can decree its complete performance against both parties *without adding to its terms.*" *Becker v. MacDonald*, 488 N.E.2d 729, 733-34 (Ind. Ct. App. 1986). Specific performance is appropriate when the contract can be completed by simultaneous acts in a single transaction that will require no further court supervision. *See Gabriel*, 843 N.E.2d at 48; *Madison Plaza v. Shapira Corp.*, 387 N.E.2d 483, 486 (Ind. Ct. App. 1979); *see also Risk v. Thompson*, 147 N.E.2d 540, 545 (Ind. 1958).

Undeveloped as the point is, PrimePay has not persuaded the court that specific performance could be completed in a single transaction, particularly when the nature of software codes is that they become obsolete and new codes must be developed. Specific performance is not an appropriate remedy when the court would need to continue to monitor the contract's performance. Nor does it make sense to order provision of source codes when the parties remain adrift, short of a trial, in understanding what could be done with them. The court ultimately need not address the point, however, because PrimePay has not sought this relief today. The court grants summary judgment because PrimePay has not presented evidence on which a reasonable jury could find damages for a breach of the Transfer Agreement (or First Amendment) based on the decision not to provide source code.

D. *Refund of Improper Charges (Count 3).*

PrimePay requests summary judgment on count three, seeking remuneration of $198,794.41 for improper charges related to the maintenance of TaxEx. It says the TSSA required OneSource (originally Crystal) to provide technical support services for TaxEx for a capped fee of $10,000 per month. PrimePay says OneSource issued invoices in 2017 and 2018 totaling $357,322.58 to cover its costs for updating and maintaining TaxEx. So that the company would continue providing necessary support services, PrimePay says it paid $198,794.41 in charges that it disputed.

In the TSSA, OneSource agreed to provide support and services for PrimePay's use of TaxEx, including training, technical support and services, and customer service [ECF 126-14 § 1]. Technical support and services included "technical services necessary and related to the performance and maintenance of [TaxEx], as reasonably agreed upon from time to time" [*Id.* § 1(B)]. TSSA Schedule A outlined fees [*Id.* (redacted); ECF 134 at 8 (unredacted)]. Technical support and services were charged "[a]fter 4 hours per month of technical support and services, [at a rate of] $125.00 per hour or agreed upon price per project." Customer services were charged at "$10,000 per month plus $0.045 per employee processed over the first 100,000 employees processed."

20

To the extent PrimePay argues that *any* charges for technical services violate the Transfer Agreement (which obligated OneSource and Crystal before it to provide improvements, modifications, and enhancement to the software free of charge), this argument is undeveloped. PrimePay dedicates one sentence in its summary judgment brief and one sentence in reply—in the middle of paragraphs arguing that the charges violated a different agreement—the TSSA. PrimePay doesn't explain why technical services are the same as improvements, modifications, and enhancements to the software or why it entered the TSSA if technical services were covered by a previous agreement. The court won't develop this point, *see Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("arguments that have been raised may still be waived . . . if they are underdeveloped, conclusory, or unsupported by law."), but it seems soundly rebutted by the structure of agreements and their language.

To the extent PrimePay argues that payments for technical support must be capped at $10,000 per month under the TSSA, no reasonable jury could find for PrimePay. A quick glance at Schedule A contradicts PrimePay's assertion. The $10,000 figure is clearly a payment schedule for customer services, not technical and support fees. It also isn't a cap on these fees, but a baseline with additional payments required for higher numbers of employees processed. No reasonable factfinder could say otherwise.

Finally, OneSource says PrimePay hasn't proven that the charges in question were improper. When discussing the payment of $198,794.41, PrimePay cites to Exhibit K as evidence. Exhibit K only shows that IOI (now in interest PrimePay) disputed the charges in one invoice (#INV_9002872). This exhibit doesn't support the conclusion that the charges in the invoice were improper—only that they were disputed. At oral argument, PrimePay contended that OneSource must show that the charges were legitimate. OneSource presents evidence via its senior vice president's declaration (Randy Black): "The amounts charged to IOI were correct based on the services that IOI requested. IOI was not

overcharged by [OneSource]." [ECF 131-2 ¶ 11]. PrimePay presents no evidence to create a triable issue for a jury. The court grants summary judgment for OneSource on count three.

E.   *Evidentiary Objections.*

The parties objected to certain exhibits within the summary judgment record. It is not mandated that the court strike noncompliant papers. In fact, requests to strike are generally disfavored, "and usually only granted in circumstances [when] the contested evidence causes prejudice to the moving party." *Rodgers v. Gary Cmty. Sch. Corp.,* 167 F. Supp.3d 940, 948 (N.D. Ind. 2016); *Kuntzman v. Wal-Mart,* 673 F. Supp.2d 690, 695 (N.D. Ind. 2009). The court isn't even required to strike inadmissible evidence: "the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson v. Morgan,* 750 F.3d 708, 714 (7th Cir. 2014) (citing Fed. R. Civ. P. 56(c)(2)-(4)). That said, the court need not address the objections to Exhibits F and P because the court relies on neither exhibit. The court overrules the other objections.

The court starts with Exhibit E. OneSource objects that this exhibit is a pleading. It isn't—a pleading is a term of art. *See* Fed. R. Civ. P. 7(a). But it is a brief—OneSource's brief from an earlier summary judgment motion. The court need not rely on this brief to reach today's conclusion because the brief references an affidavit that supports the conclusion on which PrimePay relies: that OneSource provided IOI with source code on two occasions (February 28, 2017 and November 5, 2017) and declined to do so on February 12, 2018. Even so, OneSource has not explained why its earlier admission in briefing, based on tendered evidence, should not rightly be considered now, particularly when "deliberate, clear and unambiguous." *See Robinson v. McNeil Consumer Healthcare,* 615 F.3d 861, 872 (7th Cir. 2010); *see also Soo Line R.R. v. St. Louis S.W. Ry.,* 125 F.3d 481, 483 (7th Cir. 1997); *Murrey v. United States,* 73 F.3d 1448, 1455 (7th Cir. 1996).

OneSource also objects to Exhibit G [ECF 126-7], which includes the docket sheet from the bankruptcy proceeding (Adv. Pro. 20-80109), the Sale Order, and the bankruptcy court's abstention order. OneSource only objects to the docket sheet. The docket sheet wasn't used today, nor would it be inappropriate for the court to take judicial notice of another court's readily-verifiable docket sheet. *See* Fed. R. Evid. 201; *see, e.g., Stern v. Great W. Bank*, 959 F. Supp. 478, 481 (N.D. Ill. 1997); *Cagan v. Intervest Midwest Real Estate Corp.*, 774 F. Supp. 1089, 1093 (N.D. Ill. 1991).

OneSource objects to Exhibit K as unauthenticated and hearsay [ECF 126-11]. Exhibit K includes a series of internal IOI emails from November 10, 2017; a letter from Paul McCormick to John Bax dated October 23, 2017; a check from IOI to OneSource dated October 1, 2017; and a series of emails between Paul McCormick and Randy Black from November 20, 2017. The real question is whether these documents could be rendered admissible. *See Olson*, 750 F.3d at 714. The court may only consider evidence that would be admissible at trial, but Rule 56(c)(2) explains that (excepting affidavits) a party may only object at summary judgment "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The "form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

There is no requirement that documents submitted to oppose summary judgment be fully authenticated, provided these documents can be authenticated and rendered admissible at trial and provided there is no common sense or compelling reason for the court to doubt their authenticity at summary judgment. "Merely saying that today they prove to be unauthenticated doesn't meet Rule 56's standard for objecting." *Perez v. Reitz*, 2022 U.S. Dist. LEXIS 177250, 5 (N.D. Ind. Sept. 29, 2022); *see* 11 *Moore's Federal Practice*, § 56.92 [3] (2022) ("Based on the language of the amended rule, courts have held that evidence submitted in support of or opposition to summary judgment need not be authenticated."). Best practice would be to tender an affidavit to address authenticity, not least once it has been challenged. *See Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 931 (7th Cir. 2018). These

communications internally contain indicia of authenticity, and in truth these exhibits could be authenticated—quite easily for any trial lawyer. OneSource offers no reason why not. Nor has OneSource explained cogently how these documents are being used for their truth, or why they would not qualify as non-hearsay or a hearsay exception at trial.

For its part, PrimePay asks the court to disregard the declarations of Carl Wirt, Randy Black, and John Bax. The court relies on neither the Wirt nor Bax declarations. PrimePay objects to statements by Mr. Black as inadmissible legal conclusion or opinion testimony about the Transfer Agreement's meaning. Mr. Black was the senior vice president of research and development for OneSource from 2017 to 2021 who oversaw the development and implementation of TaxEx. PrimePay points to two paragraphs in his affidavit. Neither are inadmissible opinion or legal conclusions about the Transfer Agreement's meaning.

Paragraph 10 says, "Source code and object code are types of software code. A computer program is created (or modified) by writing (or modifying) source code. The source code is then compiled to create object code (sometimes referred to as machine code) which can be executed by a computer as a computer program. TaxEx is fully functional and operable via the object code." This is materially fact testimony, perhaps in part opinion testimony based on specialized knowledge, *see* Fed. R. Evid. 602, 702, but it has not been offered (or used) to color the Transfer Agreement's language. Both parties seem to understand that both types of code exist.

Paragraph 11 speaks to whether PrimePay (IOI before it) was overcharged under the TSSA. This is fact testimony and, to the extent it strays at all into an opinion, rationally based on Mr. Black's perception and knowledge base. *See* Fed. R. Evid. 602, 701; *see also Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (opinions that are not "grounded in observation or other first-hand experience" should be stricken, not opinions in general).

F.  *Trial.*

Only count one (declaratory judgment on the Transfer Agreement) survives summary judgment. The complaint demands a jury trial, but the court now considers whether a jury trial is appropriate here. The court will order the parties to meet and confer and file a joint statement as to whether the court should convert the jury trial to a bench trial.

To aid this discussion, the court may strike a jury demand if there is no federal right to a jury trial. Fed. R. Civ. P. 38, 39(a)(2), and 57. The Seventh Amendment guarantees a right to a jury trial in suits at common law: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. At the time that the Seventh Amendment was adopted, "suits at common law" were brought in courts of law while other actions were brought in courts of equity. The Seventh Amendment right to a jury trial only applies to actions that are in the nature of actions that would have been brought in courts of law. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348 (1998). Declaratory relief often "falls on the equitable side of the divide." *Simon v. Coop. Educ. Serv. Agency #5*, 46 F.4th 602, 611 (7th Cir. 2022). "The Supreme Court has repeatedly found that declaratory judgments 'closely resemble' injunctive relief, the quintessential equitable remedy." *Id.* at 609 (collecting cases); *see Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967) ("declaratory judgment and injunctive remedies are equitable in nature").

## CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART the crossmotions for summary judgment—DENYING summary judgment for both parties on count one, GRANTING summary judgment for OneSource on count two as a breach of contract action (leaving for trial the requested declaratory relief), and GRANTING summary judgment for OneSource on count three.

[ECF 126, 129]. The court ORDERS the parties to meet and confer and file a joint statement as to whether the court should convert the jury trial to a bench trial by August 18, 2023. If so, the parties will proceed with trial preparations, albeit without need to submit jury-related pretrial filings (*e.g.*, instructions, *voir dire*, and the like). The parties may propose in their August 18 report alternatives to make the trial efficient.

SO ORDERED.

August 11, 2023                                    *s/ Damon R. Leichty*
                                                   Judge, United States District Court